IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

VIRGINIA CHAPPELL and
RESCUE DOGS ROCK ANIMAL RESCUE,
INC.

                Plaintiff,

    v.

THE HORSHAM TOWNSHIP POLICE
DEPARTMENT, et al.,

                Defendants.

CIVIL ACTION
NO. 2:16-cv-02650

## OPINION

**Slomsky, J.**                                  **November 20, 2018**

## I.    INTRODUCTION

Plaintiffs Virginia Chappell and Rescue Dogs Rock Animal Rescue, Inc. ("Rescue") bring this civil rights action under 42 U.S.C. § 1983 against the Horsham Township Police Department, Sergeant Jeffrey Woodruff, Officer Andrew Nisbet, Officer Jose Ortiz, and Lieutenant K. John Potts (collectively, "Defendants"). In the Third Amended Complaint, Plaintiffs allege that Defendants violated their Fourth Amendment rights by shooting and subsequently euthanizing a foster dog, Shayla, owned by Rescue. (Doc. No. 53.) Additionally, Plaintiffs bring state law claims for negligence and conversion. (Id.)

Defendants filed a Motion to Dismiss Plaintiff's Third Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. No. 55.) Plaintiffs filed a Response in Opposition to Defendants' Motion to Dismiss. (Doc. No. 56.) The Court ordered that Defendants' Motion to Dismiss (Doc. No. 55) be converted into a Motion for Summary Judgment, pursuant to Fed. R. Civ. P. 12(d), and afforded the parties the opportunity to supplement the record with evidence or file additional memoranda on summary judgment. (Doc.

No. 59.)  Only Defendants filed a Supplemental Briefing in Support of their Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56.  (Doc. No. 60.)  For the following reasons, the Court will grant Defendants' Motion.  (Doc. Nos. 55, 60.)

## II.  PROCEDURAL POSTURE

On May 23, 2016, before Rescue was joined as a plaintiff in this case, Virginia Chappell filed a Complaint alleging several constitutional violations, negligence, and conversion against the Horsham Township Police Department, Chief of Police William Daly, Sergeant Jeffrey Woodruff, Officer Andrew Nisbet, Officer Jose Ortiz, and Lieutenant K. John Potts (collectively, "Police Defendants").[1]  (Doc. No. 1.)  Chappell filed the claims against the Defendants in both their individual and official capacities.  (Id.)

On June 27, 2016, Defendants filed a Motion to Dismiss the Complaint.  (Doc. No. 4.) On July 10, 2016, Chappell filed a First Amended Complaint.[2]  (Doc. No. 10.)  In light of the First Amended Complaint, the Court denied Defendants' Motion to Dismiss (Doc. No. 4) without prejudice as moot.  (Doc. No. 20.)  On July 20, 2016, Defendants filed a Motion to Dismiss the Amended Complaint.  (Doc. No. 11.)

The Court granted Chappell's Motion to Amend the Complaint a second time and permitted Defendants to supplement their Motion to Dismiss (Doc. No. 11).[3]  (Doc. No. 15.)  On

---

[1]  In this initial Complaint, Chappell also named the Montgomery County SPCA and several employees as Defendants (collectively, "SPCA Defendants").  However, after receiving a $2,000 payment from the SPCA Defendants, Chappell released them from liability.  (Doc. No. 32, Ex. D.)

[2]  Chappell alleged the same claims as in the initial Complaint, but proceeded against the Police Defendants only.

[3]  Judge Stewart Dalzell, to whom this case was originally assigned, granted this Motion.  On January 4, 2017, this case was assigned to this Court (Slomsky, J.) for all further proceedings. (Doc. No. 19.)

August 3, 2016, Chappell filed the Second Amended Complaint.[4] (Doc. No. 12.) On September 23, 2016, Defendants filed a supplemental brief in support of their Motion to Dismiss. (Doc. No. 16.) On September 30, 2016, Plaintiff Chappell filed a Response in Opposition to Defendants' Motion to Dismiss. (Doc. No. 18.)

On February 22, 2017, this Court ruled on Defendants' Motion to Dismiss the First Amended Complaint (Doc. No. 11), granting it in part and denying it in part. (Doc. No. 21.) The Court dismissed all claims against Chief William Daly.[5] (Id.) The Court dismissed all claims against Sergeant Woodruff, Officer Nisbet, Officer Ortiz, and Lieutenant Potts in their official capacities. (Id.) The Court also dismissed several claims, leaving only a Fourth Amendment violation claim, two negligence claims, and a conversion claim against Sergeant Woodruff, Officer Nisbet, Officer Ortiz, and Lieutenant Potts in their individual capacities. (Id.)

Following the ruling on the Motion to Dismiss the First Amended Complaint, the parties completed fact discovery. On November 22, 2017, both parties filed Motions for Summary Judgment. (Doc. Nos. 32, 33.) In Defendants' Motion for Summary Judgment, they challenged Chappell's standing to bring her claims, arguing that Rescue, as an owner of Shayla, is the proper party with standing.[6] (Doc. No. 32 at 12-13.) Both parties filed responses to the Motions for Summary Judgment. (Doc. Nos. 36, 38.) On November 29, 2017, Chappell filed a Motion for

---

[4] Chappell withdrew the excessive force claim from the Complaint. (Doc. No. 18-1 at 23.) Chappell proceeded on all other claims filed in the initial Complaint.

[5] Because Chief Daly was dismissed as a defendant, for the remainder of this Opinion, when the Court refers to "Defendants," it is only referring to the Horsham Police Department, Sergeant Jeffrey Woodruff, Officer Andrew Nisbet, Officer Jose Ortiz, and Lieutenant K. John Potts.

[6] Defendants also challenged Chappell's standing in their Motion to Dismiss the Amended Complaint. (Doc. No. 11.) However, they did not argue that Rescue was the proper party; they just asserted that Chappell was not Shayla's owner. When ruling on that Motion to Dismiss (Doc. No. 11), the Court accepted Chappell's assertion that she owned Shayla as true and found she had standing. (Doc. No. 21 at 9-10.)

Joinder to join Rescue as a plaintiff. (Doc. No. 35.) In that Motion, Chappell acknowledges Defendants' position on standing, stating that "the evidence which has been produced suggests that the appropriate plaintiff party which owned the dog, Shayla . . . may have been Rescue Dogs Rock Animal Rescue, Inc., a Pennsylvania 501(c)(3) corporation." (Doc. No. 35 at 2.)

On January 26, 2018, this Court granted Chappell's Motion for Joinder (Doc. No. 50) and allowed Plaintiffs to file a Third Amended Complaint, which they filed on February 12, 2018. (Doc. No. 53.) On February 14, 2018, Defendants then filed a Motion to Dismiss the Third Amended Complaint. (Doc. No. 55.) On February 23, 2018, Plaintiffs filed their Response (Doc. No. 56), and on June 7, 2018, this Court denied both Motions for Summary Judgment without prejudice as moot. (Doc. No. 57.)

On August 30, 2018, during a telephone conference with counsel for the parties, the Court discussed the prospect of converting the Rule 12(b)(6) Motion to Dismiss into a Rule 56 Motion for Summary Judgment because at that point, discovery was complete. (Doc. No. 58.) Accordingly, on September 4, 2018, the Court ordered that Defendants' Motion to Dismiss be treated as a Motion for Summary Judgment pursuant to Fed. R. Civ. P. 12(d), and afforded the parties the opportunity to supplement the record with evidence and/or file additional memoranda on summary judgment. (Doc. No. 59.) On October 1, 2018, Defendants filed Supplemental Briefing in Support of their Motion for Summary Judgment Pursuant to Fed. R. Civ. P 56. (Doc. No. 60.) Plaintiffs did not supplement the record or file additional memoranda on summary judgment.

Defendants' Motion (Doc. Nos. 55, 60) is now ripe for decision. The Court has considered the record in the case, including the deposition of Virginia Chappell, the deposition of

Thomas Kasee,[7] the deposition of Jonna Amentt, the deposition of Officer Ortiz, the necropsy examination report, the statement and affidavit of neighbor Justin Health, the affidavit of Lieutenant Potts, the affidavit of Sergeant Woodruff, and the affidavit of Officer Nisbet.

## III.  FACTUAL BACKGROUND

On March 9, 2016, Chappell entered into a contract with Jonna Amentt, in which Amentt agreed to foster Shayla, a female Staffordshire mix canine.[8]  (Doc. No. 12, Ex. A.)[9]  The next day, Amentt began fostering Shayla in Hatboro, Pennsylvania, where she frequently stayed with her boyfriend, Thomas Kasee, in his mother's house.  (Doc. No. 53 at 3.)

On March 12, 2016, Kasee called the Horsham Township Police Department and requested assistance in transporting Shayla to the Society for the Prevention of Cruelty to Animals ("SPCA") because the dog was behaving aggressively.  (Doc. No. 12, Ex. B at 2.) Sergeant Woodruff was dispatched to Kasee's home.  (Id.)  A few minutes later, Officer Nisbet arrived to assist.  (Id. at 4-5.)  Kasee told the two officers that Amentt had adopted Shayla several days prior and during the time Shayla was with them, Shayla had become aggressive with him, his child, and his mother.  (Id.)  Kasee also told them that Shayla had been in multiple homes prior to Amentt taking her in.  (Id.)  Furthermore, Kasee informed them that Shayla was secured on a lead, which is similar to a leash and used to control a dog, in the backyard.  (Id.)  As the two officers continued to gather information from Kasee regarding Shayla's aggressive behavior,

---

[7]  As will be explained below, Thomas Kasee is the person in possession of Shayla and whose home Defendants went to on the day of the incident involving her.

[8]  Staffordshire terriers are commonly known as "pit bulls."  See Dias v. City & Cty. of Denver, 567 F.3d 1169, 1173 (10th Cir. 2009).

[9]  The Court is citing Exhibits attached to the Second Amended Complaint because in the Third Amended Complaint, Plaintiffs have incorporated by reference the exhibits attached to the Second Amended Complaint.  (Doc. No. 53 ¶ 13.)

Sergeant Woodruff radioed for a unit to respond with a dog pole; Officer Ortiz answered and stated he would respond accordingly.  (Id. at 5.)

Meanwhile, Sergeant Woodruff entered the backyard to assess Shayla's demeanor and to determine whether he could transport her into his vehicle using the lead.[10]  When Sergeant Woodruff entered the yard, Shayla jumped and broke free from the lead.[11]  She charged directly at Sergeant Woodruff in an aggressive manner.[12]  As Shayla got close to his legs, Sergeant Woodruff fired his gun twice at her, hitting her once.[13]  Shayla then retreated towards the back door of the house.[14]  At some point after Shayla was shot, Officer Ortiz arrived with the dog pole.  (Doc. No. 32, Ex. J at 9.)  Sergeant Woodruff and Officer Nisbet then entered Kasee's home with the dog pole, slightly opened the sliding glass door, put the dog pole through the opening, and secured it around Shayla's neck.[15]  Sergeant Woodruff then led Shayla to the police vehicle while Officer Nisbet called the Montgomery County SPCA.[16]  Sergeant Woodruff transported Shayla and Kasee to the SPCA.[17]  There, Kasee filled out the required paperwork and paid to have Shayla euthanized.[18]  Defendants became aware that Shayla was a foster dog and

---

[10] (Doc. No. 12, Ex. B at 4-5; Doc. No. 32, Ex. H at 13, 72; Doc. No. 32, Ex. R at 3; Doc. No. 32, Ex. S at 3.)

[11] Id.

[12] Id.

[13] Id.

[14] (Doc. No. 12, Ex. B at 4-5; Doc. No. 32, Ex. H at 30-32; Doc. No. 32, Ex. R at 3; Doc. No. 32, Ex. S at 3.)

[15] Id.

[16] Id.

[17] Id.

[18] Id.

that someone other than Kasee had a property interest in Shayla only after the euthanasia occurred.  (Doc. No. 32, Ex. R at 4, Ex. S at 4.)

## IV.    STANDARD OF REVIEW

Granting summary judgment is an extraordinary remedy.  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In reaching this decision, the court must determine whether "the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Favata v. Seidel, 511 Fed. App'x. 155, 158 (3d Cir. 2013) (quoting Azur v. Chase Bank, USA, Nat'l Ass'n, 601 F.3d 212, 216 (3d Cir. 2010)).  A disputed issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party.  Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  For a fact to be considered "material," it "must have the potential to alter the outcome of the case."  Favata, 511 Fed. App'x. at 158.  Once the proponent of summary judgment "points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor."  Id. (quoting Azur, 601 F.3d at 216).

In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  Id. (alteration in original) (quoting Chambers ex rel. Chambers v. Sch. Dist. of Philadelphia Bd. of Educ., 587 F.3d 176, 181 (3d Cir. 2009)).  The Court's task is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried.  Anderson, 477 U.S. at 247–249.  Whenever a factual issue arises which cannot be resolved without a credibility determination, at this stage the

Court must credit the nonmoving party's evidence over that presented by the moving party.  Id. at 255.  If there is no factual issue, and if only one reasonable conclusion could arise from the record regarding the potential outcome under the governing law, summary judgment must be awarded in favor of the moving party.  Id. at 250.

## V.    ANALYSIS

In their Motion for Summary Judgment (Doc. No. 60), Defendants argue that (1) Plaintiff Chappell lacks standing; (2) they have immunity under Pennsylvania's dog law; (3) Plaintiffs have suffered no damages; (4) Plaintiffs have failed to establish the elements of a Fourth Amendment claim under 42 U.S.C. § 1983; (5) Plaintiffs' assertion that a state policy violation amounts to constitutional liability is unsupported; (6) Plaintiffs have not established personal involvement of Officers Nisbet, Ortiz and Lieutenant Potts with respect to their Fourth Amendment claim under § 1983; (7) Defendants are entitled to qualified immunity; (8) Plaintiffs have failed to satisfy any exception to immunity under the Political Subdivision Tort Claims Act ("PSTCA"); and (9) Plaintiffs are not entitled to punitive damages, and (10) any further amendment to the Complaint would be futile.  (Id. at 17-34.)

The Court will address each of these claims seriatim.

### A.  Plaintiff Chappell Does Not Have Standing

Defendants assert that Plaintiff Virginia Chappell lacks standing to pursue her claims because Rescue and Thomas Kasee were Shayla's owners, whereas Chappell was not.  (Doc. No. 55 at 16.)

For a plaintiff to have standing, she must establish (1) that she has suffered an "injury in fact," which is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) that there is a "causal connection between the injury and the conduct complained of"; and (3) that it is likely

that the injury will be "redressed by a favorable decision." Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992) (citations omitted).

In the context of the Fourth Amendment, standing depends on "whether the disputed search and seizure has infringed upon an interest of the defendant which the Fourth Amendment was designed to protect." Rakas v. Illinois, 439 U.S. 128, 140 (1978). Furthermore, a plaintiff must assert her "own legal rights and interests rather than basing [her] claim for relief upon the rights of third parties." Id. at 139. Thus, a plaintiff has standing to challenge a seizure if she (1) asserts her own property rights; and (2) alleges an injury in fact. Eiland v. Jackson, 34 Fed. App'x. 40, 42 (3d Cir. 2002); see also Mitan v. U.S. Postal Inspection Serv., 656 Fed. App'x. 610, 615 n.6 (3d Cir. 2016) (holding that a plaintiff has standing under the Fourth Amendment if she "held a possessory interest in the property at the time of the seizure").

The Third Circuit has held that a dog's owner has a possessory interest in the dog. Brown v. Muhlenberg Township, 269 F.3d 205, 210 (3d Cir. 2001). Under Pennsylvania's Dog Law, a dog's owner "includes every person having a right of property in such dog, and every person who keeps or harbors such dog or has it in his care, and every person who permits such dog to remain on or about any premises occupied by him." 3 Pa. Stat. Ann. § 459-102.

In this case, Plaintiff Chappell was not one of Shayla's owners. Under the terms of the foster agreement with Joanna Amentt, Rescue, not Chappell, retained the sole property right to Shayla. (Doc. No. 12, Ex. A.) Furthermore, Chappell did not have Shayla in her care or on her premises. On March 12, 2016, Thomas Kasee was keeping Shayla on his premises and in his care. Because Chappell did not own Shayla, she did not maintain any possessory interest in her

at the time of the shooting, and she does not have standing to bring the claims alleged in this case.[19]

## B. Plaintiff's Fourth Amendment Claim Will Be Dismissed Because the Officers' Seizure Was Reasonable

Plaintiff brings a claim against Defendants under § 1983, which provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . .

42 § U.S.C. 1983.

This statute "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and the federal statutes that it describes." Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979). In order to successfully bring a § 1983 claim, a plaintiff must show: (1) the defendants deprived her of a federal right, (2) the defendants acted under color of state law, and (3) the deprivation or violation caused an injury. Gomez v. Toledo, 446 U.S. 635, 640 (1980); Elmore v. Cleary, 399 F.3d 279, 281 (3d Cir. 2005). A defendant acts under color of state law when he acts on behalf of the State or is employed by the State, and acts "in his official capacity or while exercising his responsibilities pursuant to state law." West v. Atkins, 487 U.S. 42, 50 (1988).

---

[19] In the Opinion on the Motion to Dismiss the Second Amended Complaint, this Court found that Plaintiff Chappell had standing. (Doc. No. 21 at 9-10.) At the pleading stage of this litigation, the Court accepted as true Chappell's assertion that she owned Shayla. See Buck, 452 F.3d at 260. Discovery has revealed, however, that Rescue has standing and Chappell does not. Plaintiffs appear to acknowledge this fact. (Doc. No. 35 at 2 (stating in the Motion for Joinder that "the evidence which has been produced suggests that the appropriate plaintiff party which owned the dog, Shayla . . . may have been Rescue Dogs Rock Animal Rescue, Inc., a Pennsylvania 501(c)(3) corporation").) Plaintiff Chappell therefore will be dismissed and Rescue will proceed as the sole plaintiff in this action. Accordingly, when the Court refers to "Plaintiff" in the remainder of the Opinion, it is referring to Rescue only.

State officials are not subject to liability under § 1983 when sued in their official capacities because the suit essentially is against the State itself.  Hafer v. Melo, 502 U.S. 21, 26 (1991) (citing Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989)).  However, state officials can be held liable in their individual capacities for actions they take in their official capacities.  Id. at 27.  In order to hold a state official liable in his individual capacity, a plaintiff must show that the state official was either personally involved in the alleged constitutional deprivation or, acting in a supervisory capacity, was aware of and acquiesced in his subordinates' violations.  Parratt v. Taylor, 451 U.S. 527, 537 n.3 (1981); Baker v. Monroe Twp., 50 F.3d 1186, 1190 (3d Cir. 1995).  Thus, liability under § 1983 may not be imposed solely on a respondeat superior theory.  Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978); Hampton v. Holmesburg Prison Officials, 546 F.2d 1077, 1082 (3d Cir. 1976).

Plaintiff asserts that Defendants violated its Fourth Amendment rights by unreasonably seizing its dog, Shayla.  (Doc. No. 53 at 7.)  The Fourth Amendment provides that "the right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend. IV.  A person's "effects" include their personal property.  United States v. Place, 462 U.S. 696, 701 (1983).  A "seizure" of personal property occurs "when there is some meaningful interference with an individual's possessory interests in that property."  United States v. Jacobsen, 466 U.S. 109, 113 (1984).  Under Pennsylvania law, a dog is considered "personal property" and thus, an "effect" for the purposes of the Fourth Amendment.  3 Pa. Stat. Ann. § 459-601(a).  Furthermore, the Third Circuit has concluded that the shooting of a dog by a police officer constitutes a Fourth Amendment seizure.  Brown, 269 F.3d at 210-11.

A seizure is constitutionally permissible if it was reasonable.  Id. at 210.  The Court's reasonableness inquiry is an objective one; it must determine whether the officers' actions are "'objectively reasonable' in light of the facts and circumstances confronting them."  Graham v. Connor, 490 U.S. 386, 397 (1989).  In determining the reasonableness of a seizure, the Court "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion."  Place, 462 U.S. at 703.  This analysis is highly fact specific and requires consideration of the "totality of the circumstances."  Graham, 490 U.S. at 396 (citing Tennessee v. Garner, 471 U.S. 1, 8-9 (1985)).  The reasonableness of a seizure "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" because "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain and rapidly evolving—about the amount of force that is necessary in a particular situation."  Id. at 396-97.  Furthermore, the reasonableness standard does not require "an officer to choose the single best possible response" so long as the response he chooses is "justified by the circumstances."  Pettit v. New Jersey, No. 09-cv-3735, 2011 WL 1325614, at *7 (D.N.J. Mar. 30, 2011).

The Third Circuit has established that, regarding dogs, public safety is a legitimate governmental interest:

> Where a pet is found at large, the state undoubtedly has an interest in restraining it so that it will pose no danger to the person or property of others.  The dog catcher thus does not violate the Fourth Amendment when he or she takes a stray into custody.  Moreover, the state's interest in protecting life and property may be implicated when there is reason to believe the pet poses an imminent danger.  In the latter case, the state's interest may even justify the extreme intrusion occasioned by the destruction of the pet in the owner's presence.

Brown, 269 F.3d at 211 (emphasis added).[20]

In this case, Defendants, as police officers acting under the authority given to them by the state of Pennsylvania, acted under color of state law for the purposes of § 1983. Additionally, as Brown makes clear, Defendants' shooting of Shayla constituted a Fourth Amendment seizure. 269 F.3d at 210-11. Therefore, for Plaintiff to succeed, it must show that Defendants' seizure was unreasonable. If Plaintiff establishes unreasonableness, it also must show that each Defendant was personally involved in this constitutional violation.

Defendants have cited extensively to Brown to support their argument that no unreasonable seizure occurred in this case. (Doc. No. 55.) In that case, the Browns' three-year-old Rottweiler wandered into a parking lot, adjacent to the home, after the latch on the back gate of their fence had failed, unbeknownst to them. 268 F.3d at 209. The dog, wearing a bright pink collar with tags on it, was seen sniffing and walking around the parking lot and near the Browns' fence by a stranger parked in the lot. Id. An officer passed by in his patrol car, pulled over once he saw the Browns' dog, and entered the parking lot. Id. When the officer approached the dog and tried calling to her, she barked and then withdrew away from him. Id. The officer then walked to a position ten to twelve feet away from the dog. Id. The dog was stationary and was not growling or barking. Id. The individual observing from his car stated that the dog "did not display any aggressive behavior towards [the officer] and never tried to attack him." Id. Indeed,

---

[20] See also Warboys v. Proulx, 303 F. Supp. 2d 111 (D. Conn. 2004) (holding that it was reasonable for an officer to shoot a 90-to-100-pound pit bull that was not able to be restrained by its owner and was approaching the officer at rate of six feet per second and was less than ten feet away when shot); Hartman v. Pennsylvania, No. 1:15-CV-523, 2016 WL 4549513 (M.D. Pa. Sept. 1, 2016) (holding that it was reasonable for an officer to shoot an agitated dog that had run toward him and stopped, but that was five to seven yards away, growling at him with its head lowered and hair raised); Altman v. City of High Point, 330 F.3d 194 (4th Cir. 2003) (holding that officers acted reasonably when they shot four dogs that were all running at large and had previously attacked someone or were acting aggressively when approached).

the Browns' dog "had not previously been violent or aggressive towards anyone" in the past. Id. Mrs. Brown, looking out of an open, screened window in her home, observed the officer reach for his gun while facing her dog. Id. Mrs. Brown screamed "That's my dog, don't shoot!" as loudly as she could. Id. The officer "hesitated for a few seconds and then pointed his gun" at the dog while Mrs. Brown "tried to break through the window's screen" while shouting "No!" at the officer. Id. The officer fired at the dog and continued to fire four more shots, even as she fell down and was trying to crawl away. Id. In ruling on the defendants' motion to dismiss, the court held that the officer's "destruction of [the dog] could be found to be an unreasonable seizure within the meaning of the Fourth Amendment" because the dog did not pose an immediate danger to the officer and the owner was present and desirous of retaining custody. Id. at 211.

The instant case contrasts significantly with Brown because here, unlike in Brown, the dog posed an immediate danger to Sergeant Woodruff when he shot her. The evidence adduced in discovery supports this conclusion.[21] Discovery revealed that all three eyewitnesses present—Thomas Kasee, Sergeant Woodruff, and Officer Nisbet—agree that Shayla jumped in Sergeant Woodruff's direction when he entered the backyard, broke the lead she was secured on, and began to run at him at full speed, growling with her teeth out. (Doc. No. 33, Ex. 7 at 5; Doc. No. 32, Ex. R at 3, Ex. S at 3.) Sergeant Woodruff then fired two shots at Shayla, striking her once. (Doc. No. 33, Ex. 7 at 5; Doc. No. 32, Ex. R at 3, Ex. S at 3.)

---

[21] As noted, when this Court ruled on the Motion to Dismiss the Second Amended Complaint, discovery had not yet been completed. Now that it has been completed, the Court is permitted to consider facts revealed through discovery in ruling on the Motion to Dismiss, which has been converted to a Motion for Summary Judgment (Doc. Nos. 55, 60). Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 560 (3d Cir. 2002).

Plaintiff asserts that Shayla was running away from Sergeant Woodruff when he shot her. To support this conclusion, Plaintiff hired an expert to complete a necropsy[22] examination of Shayla. (Doc. No. 32, Ex. N.) Viewing the necropsy report in the light most favorable to Plaintiff, it does not state the direction Shayla was running when she was shot. (Id.)[23] The examiner only found that "the shots were fired from above the dog and from the left side of the body." (Id.)

Plaintiff was not present when the shooting occurred. Three eyewitnesses present at the scene all said that Shayla was attacking Sergeant Woodruff when she was shot. Therefore, even when viewing the evidence in the light most favorable to Plaintiff and drawing all inferences in its favor, the evidence supports the conclusion that the dog was not running away from Sergeant Woodruff, but rather was running toward him.

Furthermore, unlike the dog in Brown, the evidence shows that Shayla had a history of aggression. Shayla would charge, bark, and growl at Thomas Kasee whenever he was near her. (Doc. No. 33, Ex. 7 at 16.) On the morning of March 12, 2016, Shayla grabbed Kasee by his pant leg and "ripped him through the kitchen." (Doc. No. 33, Ex. 6 at 12.) Additionally, Kasee's neighbor submitted an affidavit recounting the day before the shooting, when Shayla was acting extremely aggressively to the point that Jonna Amentt could not control her. (Doc. No. 32, Ex. P at 2.) The neighbor explained how Shayla, unprovoked, attempted to break through his fence to where his children and his dog were playing. (Id.) Just as he brought his

---

[22] A necropsy is "[a]n autopsy performed on an animal." Necropsy, Merriam Webster, https://www.merriam-webster.com/dictionary/necropsy (last visited Aug. 6, 2018).

[23] Plaintiff argues that Shayla was running away from Sergeant Woodruff when he shot the dog. This argument is not supported by the necropsy report or by any other evidence in the record.

dog and his children back into his home, Shayla jumped over the fence into his yard, growling and barking.  (Id. at 3.)

On March 12, 2016, when Sergeant Woodruff and Officer Nisbet arrived at Kasee's household, Kasee informed them of Shayla's repeated aggression toward him and of her hostile tendencies toward males in general.  (Doc. No. 32, Ex. S at 2.)  Indeed, when the officers first arrived, Shayla was "agitated."  (Id. at 3.)  In Brown, the dog was simply "sniffing and casually walking" around the area before the officer arrived.  269 F.3d at 209.  Even when the officer did approach the Browns' dog, she did not display any signs of aggression toward him, consistent with her lack of violence in the past.  Id.  This case is therefore distinguishable from Brown because Shayla's history and observable behavior before and during the shooting support the conclusion that Shayla would physically attack Sergeant Woodruff before she was shot.

In response to this body of evidence produced in discovery, Plaintiff has failed to produce any evidence supporting the conclusion that Shayla was not acting aggressively and not attacking Sergeant Woodruff.  In this regard, Plaintiff has failed to submit sufficient facts to show the seizure of Shayla was unreasonable.  Moreover, because the Court finds that no constitutional violation occurred, it does not need to address whether each Defendant was personally involved in the alleged violation.  Plaintiff's § 1983 claim for a Fourth Amendment violation will be dismissed.

**C.  Defendants are Entitled to Qualified Immunity Because the Facts Do Not Clearly Establish a Violation of a Constitutional Right**

Defendants assert they are entitled to qualified immunity.  (Doc. No. 55 at 27-29.) Qualified immunity is "an immunity from suit rather than a mere defense to liability" and therefore should be resolved as early as possible.  Mitchell v. Forsyth, 472 U.S. 511, 526 (1975). Qualified immunity protects state officials acting in a discretionary capacity from liability so

long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). A right is clearly established if its contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987).

The Court conducts a two-step inquiry when deciding whether to grant qualified immunity to a defendant. Saucier v. Katz, 533 U.S. 194, 200 (2001). The Court must determine (1) whether the facts alleged or shown establish that the state official's conduct violated a constitutional right; and (2) whether the right was clearly established at the time of the alleged violation.[24] Id. at 201. If the facts alleged do not establish a constitutional violation, the qualified immunity inquiry ends there. Id. If a right was not clearly established at the time of the alleged violation, then the officials are entitled to qualified immunity. Id. However, even if an official violated a clearly established right, if the official "made a reasonable mistake as to what the law requires," he is still entitled to qualified immunity. Carswell v. Borough of Homestead, 381 F.3d 235, 242 (3d Cir. 2004) (citing Saucier, 533 U.S. at 205). Thus, the qualified immunity inquiry focuses significantly on the objective reasonableness of an official's conduct and requires the Court to examine the information possessed by the officials at the time of the action. Anderson, 483 U.S. at 641.

In Brown, the Third Circuit determined that a reasonable law enforcement officer would know that a person's dog is personal property under Pennsylvania law and that it would be "unlawful for him to destroy a citizen's personal property in the absence of a substantial public

---

[24] This sequence is not mandatory; the Court has discretion "in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson v. Callahan, 555 U.S. 223, 236 (2009).

interest that would be served by the destruction." 269 F.3d at 211. The court determined the officer who shot the Brown's dog was not entitled to qualified immunity because a reasonable officer in his position "could not have applied these well-established principles to the situation before him and have concluded that he could lawfully destroy a pet who posed no imminent danger and whose owners were known, available, and desirous of assuming custody." Id.

In this case, the Court finds that the facts do not establish that a constitutional violation occurred. While the shooting of a dog does constitute a seizure under the Fourth Amendment, the seizure in this case was a reasonable one, as discussed supra. While the officer in Brown could not establish objective reasonableness, Defendants can.

Even if the Court were to find that Defendants violated a constitutional right, they would still be entitled to qualified immunity because their actions were reasonable given the information that they had when Shayla was shot. Specifically, Sergeant Woodruff was dispatched to Kasee's house in response to a request for assistance dealing with an aggressive animal. (Doc. No. 12, Ex. B at 4-5.) Upon arrival to the house, Kasee told him that the dog had been aggressive with Kasee, his child and his mother. (Id.) Kasee also mentioned that the dog had been in multiple adopted homes before this one. (Id.) When Sergeant Woodruff assessed Shayla's demeanor, she broke free from her lead and charged directly at him. (Id.)

Under these circumstances, there is no clearly established law that would be known to Defendants that would put them on notice that Shayla could not be shot. Because the individual Defendants would be entitled to qualified immunity, the federal cause of action alleged here will be dismissed for this reason too.

### D. State Law Claims

#### 1. Defendants Have Immunity Under Pennsylvania's Dog Law

Defendants further assert that they are entitled to immunity under Pennsylvania's Dog

Law. (Doc. No. 55 at 18-20.) The statute provides in relevant part:

> Any person may kill any dog which he sees in the act of pursuing or wounding or killing any domestic animal, wounding or killing any dogs, cats, or household pets, or pursuing, wounding, or attacking human beings, whether or not such a dog bears the license tag required by provisions of this act. There shall be no liability on such persons in damages or otherwise for such killing.

3 Pa. Stat. Ann. § 459-501(a).

Plaintiff argues that Defendants are not entitled to immunity under this statute because

"Shayla was not engaged in any of the behaviors that would justify killing her until the officers

entered the premises to remove her at the request of a person they knew was not her actual

owner." (Doc. No. 38 at 5.) In response, Defendants submit that, under Pennsylvania law, Kasee

was one of Shayla's owners. (Doc. No. 55 at 14.) The statute defines "owner" as "every person

having a right of property in such dog, and every person who keeps or harbors such dog or has it

in his care, and every person who permits such dog to remain on or about any premises occupied

by him." 3 Pa. Stat. Ann. § 459-102. This definition is relatively broad and does not

contemplate a specific amount of time required for an individual to become an owner.[25]

Therefore, because Kasee allowed Shayla to "remain on or about any premises occupied by him"

from March 10, 2016, when Amentt first picked up Shayla, to March 12, 2016, when Shayla was

killed, the Court agrees with Defendants that Kasee was a legal owner of Shayla.

Furthermore, Defendants assert that at the time of the shooting, they were unaware that

anyone other than Kasee and Amentt had any property interest in Shayla. (Doc. No. 55 at 18;

---

[25] See Commonwealth v. Lopez, 908 A.2d 991, 996 (Pa. Commw. Ct. 2006) (acknowledging that § 459-102 is "broader than a person simply having a property interest in a dog").

Doc. No. 32, Ex. R at 4-5, Ex. S at 3-4.)  In both Sergeant Woodruff's and Officer Nisbet's affidavits, they explain that they were under the impression that Kasee was the legal owner of Shayla and had possession, care, and custody of the dog.  (Doc. No. 32, Ex. R at 5, Ex. S at 4.) Based on this knowledge, when Defendants entered Kasee's yard, they believed they were assisting an owner in securing an aggressive dog.  Therefore, Plaintiff has not offered sufficient evidence to establish that Defendants were aware that Plaintiff had any property interest in Shayla before the shooting occurred.

Moreover, Sergeant Woodruff explained that he entered the yard to determine whether Shayla could be transported into a police vehicle using the lead she was attached to.  (Doc. No. 32, Ex. R at 5.)  While doing so, Shayla broke the lead and ran directly and aggressively at him. At that point, Shayla was "pursuing, wounding, or attacking [a] human being." 3 Pa. Stat. Ann. § 459-501(a).  Therefore, Sergeant Woodruff was permitted to shoot her under Pennsylvania law. Plaintiff has not offered sufficient evidence to establish that Shayla was not charging at Sergeant Woodruff when she was shot.  Consequently, Defendants are entitled to immunity under the Pennsylvania Dog Law, and for this reason, and others discussed infra, the state law claims brought against them will be dismissed.

### 2. Plaintiff's Conversion Claim Will Be Dismissed Because the Shooting of Shayla Was Legally Justified Under Pennsylvania Law

Defendants also argue that Plaintiff's conversion claim against Defendants is precluded because the shooting and euthanasia of Shayla was legally justified under Pennsylvania's Dog Law.  (Doc. No. 55 at 32.)  Conversion is "the deprivation of another's right of property in, or use or possession of, chattel, or other interference therewith, without the owner's consent and without lawful justification."  PTSI, Inc. v. Haley, 71 A.3d 304, 314 (Pa. Super. 2013). Furthermore, conversion is limited "to those serious, major, and important interferences with the

right to control chattel which justify requiring the defendant to pay its full value." Id. (citing Restatement (Second) of Torts § 222A cmt. c (Am. Law. Inst. 1965)).

Here, Defendants were acting with the consent of Thomas Kasee to enter the yard and secure Shayla. The Court has determined that under Pennsylvania law, Kasee was an owner of Shayla. The Court also has determined that, because Shayla was "pursuing, wounding, or attacking [a] human being" when she was shot, Defendants are not subject to liability under § 459-501(a) of Pennsylvania's Dog Law. In light of the evidence adduced in discovery, Plaintiff has not sufficiently alleged facts that establish that Defendants were not acting at the direction of an owner and were not legally justified in shooting Shayla. Therefore, Plaintiff's conversion claim will be dismissed for this additional reason.

### 3. Defendants Are Entitled to Immunity Under the Pennsylvania Political Subdivision Tort Claims Act Because They Never Maintained Total Control of Plaintiff's Property

In Counts IV and V, Plaintiff brings negligence claims against the Horsham Police Department under § 8542 of the PSTCA, which states, in relevant part:

(a) Liability imposed. — A local agency shall be liable for damages on account of an injury to a person or property within the limits set forth in this subchapter if both of the following conditions are satisfied and the injury occurs as a result of one of the acts set forth in subsection (b):

(1) The damages would be recoverable under common law or a statute creating a cause of action if the injury were caused by a person not having available a defense under section 8541 (relating to governmental immunity generally) or section 8546 (relating to defense of official immunity); and

(2) The injury was caused by the negligent acts of the local agency or an employee thereof acting within the scope of his office or duties with respect to one of the categories listed in subsection (b). As used in this paragraph, "negligent acts" shall not include acts or conduct which constitutes a crime, actual fraud, actual malice or willful misconduct.

   (b) Acts which may impose liability. — The following acts by a local agency or any of its employees may result in the imposition of liability on a local agency:

                    \* \* \*

      (2) Care, custody or control of personal property. — The care, custody or control of personal property of others in the possession or control of the local agency. The only losses for which damages shall be recoverable under this paragraph are those property losses suffered with respect to the personal property in the possession or control of the local agency.

                    \* \* \*

      (8) Care, custody or control of animals. — The care, custody or control of animals in the possession or control of a local agency, including but not limited to police dogs and horses . . . .

42 Pa. C.S.A. § 8542.

     Plaintiff brings claims under both § 8542(b)(2) and (b)(8). (Doc. No. 53 at 9-10.) First, as Defendants point out, because dogs are considered personal property under Pennsylvania law, § 8542(b)(2) is the only relevant subsection in this case. (Doc. No. 55 at 31.) Therefore, Plaintiff's claim under § 8542(b)(8), the animal exception, will be dismissed because that subsection is not relevant. (Id.)

     Next, Defendants argue that they never "took exclusive possession of Shayla to the exclusion of its owner, Thomas Kasee" and therefore, Plaintiff has not sufficiently pled an exception to the PSTCA. (Id.) In support of their argument, Defendants cite to both Schor v. North Braddock Borough, 801 F. Supp. 2d 369 (W.D. Pa. 2011), and Allegrino v. Conway E&S, Inc., No. 09-1507, 2010 WL 3220045 (W.D. Pa. Aug. 12, 2010). (Doc. No. 55 at 31.) In Schor, the court determined that the local agency was entitled to immunity under the PSTCA because it did not have control or possession of the plaintiff's dog.[26] 801 F. Supp. 2d at 382. The court in

_____

[26] In that case, the officer was "no closer than ten (10) feet" from the plaintiff's dog when he encountered and shot her. Schor, 801 F. Supp. 2d at 382. Notably, the court determined lack

<u>Schor</u> cited to <u>Allegrino</u> for a reference on "possession," although <u>Allegrino</u> dealt with the real property exception under the PSTCA. <u>Id.</u> In that case, the court determined that "'[p]ossession' for purposes of the real property exception means 'total control over premises' for more than a limited amount of time" and that "[a]ny type of limited control . . . is insufficient to impose liability on the governmental body." <u>Allegrino</u>, 2010 WL 3220045, at *5. The court determined that because the governmental agency maintained joint custody and control of the property with the building's owners, the agency did not have "total control" and was entitled to immunity. <u>Id.</u>

Plaintiff argues that Defendants had Shayla in their custody and control for approximately two to two and a half hours when they shot her, grabbed her with the catchpole, put her into the police vehicle, and drove her to the SPCA to be euthanized. (Doc. No. 56 at 27.) Defendants do not assert, however, that they did not maintain any control and possession of Shayla; they argue instead that they shared custody with Thomas Kasee and therefore did not maintain total control for more than a limited amount of time. (Doc. No. 55 at 31-32.)

The Court will follow <u>Allegrino</u>'s definition of possession to the personal property as applied to an animal. The Court has already determined that Thomas Kasee was an owner of Shayla under Pennsylvania law. Thus, under <u>Allegrino</u>, Defendants maintained joint control of Shayla with Kasee, which does not amount to total control. In any event, their joint control of Shayla was for a limited amount of time. Therefore, because they never maintained total control of Shayla for more than a limited amount of time, Defendants are entitled to immunity under the PSTCA, and for this reason too, the state claims brought against them will be dismissed.

---

of control or possession under both the personal property exception and animal exception of the PSTCA. <u>Id.</u> at 382 n.7.

### E. Plaintiff Is Not Entitled to Punitive Damages Because the Fourth Amendment Seizure of Shayla Was Reasonable

Defendants argue that Plaintiff has failed to establish evidence of malicious or callous conduct sufficient to support a punitive damages award. (Doc. No. 55 at 32-33.) Plaintiffs bringing § 1983 claims cannot recover punitive damages against a municipal entity or its officials in their official capacities. Debellis v. Kulp, 166 F. Supp. 2d 255, 281-82 (E.D. Pa. 2001). For this reason, Plaintiffs would not be entitled to punitive damages against the Horsham Police Department. However, plaintiffs may recover punitive damages against defendants in their individual capacities if "the defendants have acted with a 'reckless or callous disregard of, or indifference to, the rights and safety of others.'" Keenan v. City of Philadelphia, 983 F.2d 459 (3d Cir. 1992) (citation omitted).

Here, Plaintiff contends that Defendants' conduct was "willful, malicious, oppressive and/or reckless" and punitive damages therefore are warranted. (Doc. No. 53 at 7.) However, because the Court has concluded that the Fourth Amendment seizure of Shayla was reasonable, Plaintiff is not entitled to any damages, including punitive ones.

### F. The Court Will Not Grant Leave to Amend Because Amending the Complaint Would Be Futile

Finally, Defendants argue that any attempt by Plaintiff to amend the Complaint a fourth time would be futile. (Doc. No. 55 at 33-34.) Although Plaintiff has not requested leave to amend the Complaint again, the Court agrees that any further attempt to amend would be futile. Under Federal Rule of Civil Procedure 15(a), leave to amend is freely given, in the absence of reasons such as undue delay, bad faith, undue prejudice to the opposing party, or futility of the amendment. Fed. R. Civ. P. 15(a). Futility exists "if the amendment will not cure the deficiency in the original complaint or if the amended complaint cannot withstand a renewed motion to

dismiss." Jablonski v. Pan Am. World Airways, 863 F.2d 289, 292 (3d Cir. 1988) (citing

Massarsky v. Gen. Motors Corp., 706 F.2d 111, 125 (3d Cir. 1983)).

Considering that discovery has already been completed in this case, no amendment of the Complaint a fourth time could cure the factual insufficiency presented here. Therefore, the Court will not grant leave to amend the Second Amended Complaint.

## VI. CONCLUSION

For the reasons noted above, the Court will grant Defendants' Motion to Dismiss (Doc. Nos. 55, 60), which has been converted into a Motion for Summary Judgment. An appropriate Order follows.